UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 12-89 (JRT/LIB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Timothy Clarence Stately, | |
| Defendant. | |

This matter came before the undersigned United States Magistrate Judge upon Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure executed on May 31, 2011. The matter has been referred to the Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held an evidentiary hearing on June 8, 2012 regarding the suppression motion at issue, and the parties thereafter submitted written argument on the motion. For the reasons outlined below, the Court recommends that Defendant's motion to suppress be denied.

## I.      BACKGROUND

This case involves a May 31, 2011 police search of Defendant's mother's home on the Red Lake Indian Reservation, during which police recovered a sawed-off shotgun and a box of ammunition from a closet in the basement.

At the June 8, 2012 hearing the parties called two witnesses:  Defendant called Captain Dana Lyons and the Government called Criminal Investigator Colin Brunelle (C.I. Brunelle).[1]

---

[1] C.I. Brunelle at the time of the events was employed by the Department of Public Safety for the Red Lake Band of Chippewa. He had been employed in that capacity for 5 years but had worked in law enforcement for more than 27 years.

1

C.I. Brunelle was the person who filed the affidavits in support of the search warrant and who executed the search warrant.[2]

### a. Facts Provided in the Affidavit Submitted in Support of the Search Warrant[3]

On May 30, 2011, at approximately 11:28 p.m., police received an emergency call from Marlys Schoenborn regarding a drive-by shooting at her residence in Redby, Minnesota, south of the intersection of Highway 1 and Highway 40.  In the grass next to the road going past Ms. Schoenborn's property, police recovered two spent 12-gauge shotgun casings that were red in color.[4]

Shortly thereafter, at 12:49 a.m. on May 31, 2011, police received an emergency call that a trailer house was on fire in the Big Stone area.  Captain Dana Lyons[5] responded to the call and upon his arrival discovered two red shotgun shell casings in the driveway of the property where the house was on fire.  Capt. Lyons also observed broken glass on the ground that, as phrased in the search warrant, was "from a possible busted window from a vehicle."

At 1:23 a.m. on May 31, 2011, police received another emergency call from Dawn Schoenborn, reporting a drive-by shooting at her home in Redby, Minnesota.  However, the responding officers did not observe any damage to the home and were unable to recover any bullets or shotgun casings.[6]

---

[2] Because any information provided at the hearing, with the exception of information merely putting into context the facts included in the affidavit in support of the search warrant, may not be used to determine if probable cause exists for the search warrant on its face, the Court considers the testimony from C.I. Brunelle and Capt. Lyons separately from the information within the affidavit.

[3] The affidavit and search warrant were submitted by the Government, and admitted by the Court, as Government Exhibit 1.

[4] Although not included in C.I. Brunelle's affidavit, C.I. Brunelle testified at the hearing that officers did not arrive at Ms. Marlys Schoenborn's residence until approximately 1:15 a.m., when she had again called police to inquire why nobody had come to investigate.

[5] At the time of these events, Capt. Lyons had not yet been promoted from sergeant.

[6] Although not included in C.I. Brunelle's affidavit, C.I. Brunelle testified at the hearing that Dawn Schoenborn reported that she "possibly" saw a two-door vehicle at the residence.

After the occurrence of these events, additional officers were called to the area, and C.I. Brunelle directed other officers to take note of the license plate numbers for all vehicles seen in the area. Then, at approximately 3:45 a.m., Capt. Lyons called-in the license plate numbers of two vehicles he observed in the McBride's area. Upon a registration search, it was determined that one of the vehicles belonged to a Ms. Doris Kingbird and the other belonged to Defendant. The Defendant's vehicle was seen by Capt. Lyons turning into the McBride's area. Defendant's vehicle was a four-door, dark blue 2000 Pontiac.

Only six minutes later, C.I. Brunelle, who was parked at the Jambie's store in Redby, heard a gunshot that appeared to come from the southeast. Four minutes later, Ms. Jillian Jones made a call to the police and advised them that someone had fired shots at her home located in the McBride's area. No vehicles were observed in the area, and C.I. Brunelle, after discovering the owners of the vehicles seen earlier, requested that other offices attempt to locate the two vehicles. Officer Harlan Johnson soon discovered that the vehicle belonging to Defendant was "parked behind his mother['s] home on the north side of [Highway] 1 by [the] intersection [with Highway] 40."

While the investigation with respect to the first three events was ongoing, but prior to the shooting at Ms. Jones's home, police received an emergency call purportedly reporting gunshots in the Ponemah, Minnesota area. Upon Capt. Lyons's request, the police dispatch provided that the call was placed, however, "from ¼ mile west of mile marker 125 which is the same area that Tim Stately['s] mother lives."

**b.   Facts Provided at the Hearing but not Specifically Included in the Affidavit Submitted in Support of the Search Warrant**

At the hearing on June 8, 2012, the Government submitted, and the Court admitted over Defendant's objection, a demonstrative aerial map of the Redby, Minnesota area, which also included notations about the three locations where shots had been fired, the location of the arson, and the location of Defendant's mother's home.  (See Gov't Ex. 2).  Based on the exhibit, C.I. Brunelle provided some additional information pertaining to the facts that he had included in his affidavit in support of the search warrant.

In describing the location of Ms. Stately's residence, C.I. Brunelle provided that it was approximately one mile from Ms. Marlys Schoenborn's residence and approximately twelve miles from Ms. Alberta Norris's residence (the trailer house on fire).

 C.I. Brunelle also testified that at the time Capt. Lyons reported the license plate numbers for the two vehicles he observed, his vehicle was parked at the intersection of Highway 1 and the McBride's area, commonly referred to as "McBride's loop" (as identified on the Government's Exhibit 2).[7]  As depicted on the map, and as described by C.I. Brunelle, the McBride's loop area was very small and there were only two ways in and out of it: one was the northern road on which Capt. Lyons was located at 3:45 a.m. when he observed Defendant enter the area and another road leading to Highway 40.   C.I. Brunelle also provided that at the time Capt. Lyons reported Defendant's license plate, C.I. Brunelle was parked at "Jambie's store" in Redby, Minnesota, which was located approximately three-quarters of a mile from the

---

[7] At the hearing, on cross-examination, C.I. Brunelle testified that there were more than 10 other license plate numbers that were called in by other officers in the larger area generally depicted by the Government's Exhibit 2, but no information was provided as to where the license plate numbers were observed specifically and how close they were to the McBride's area.

McBride's area and was also where he was located when he heard the gunshot from the southeast, which was in the direction of the McBride's area.

C.I. Brunelle also clarified that when Capt. Lyons observed Ms. Kingbird's vehicle, it was leaving the McBride's area as opposed to Defendant's vehicle, which was entering the McBride's area and also reiterated that those were the only two vehicles Capt. Lyons observed in the area during that time.  C.I. Brunelle further testified that when other officers responded to the emergency call from Ms. Jones's residence, they approached from the north road leading into the McBride's area and observed no other vehicles.

In addition to the facts pertaining to the information in C.I. Brunelle's affidavit, C.I. Brunelle testified with respect to some information that was inadvertently omitted from his affidavit in support of the search warrant.  Namely, that several police officers were dispatched to the residence of Ms. Stately (Defendant's mother) and they observed that Defendant's vehicle, parked at Ms. Stately's  residence, had a broken window on the back passenger side and shattered glass scattered throughout the back seat.  C.I. Brunelle testified that although he was aware of this fact prior to submitting his affidavit in support of the search warrant and meant to include it in the affidavit, he failed to do so because he was dealing with four major crime scenes and had been working continuously for more than 24 hours.  On cross-examination, C.I. Brunelle stated that he understood it was his responsibility to provide information in the affidavit that would establish probable cause to support the search warrant.

C.I. Brunelle provided some additional information with respect to the emergency phone call that had been placed from one-quarter mile west of mile marker 125, which was close to the residence of Defendant's mother: Ms. Stately.  He explained that based on his prior experience of receiving phone calls to divert officers from an area where they were currently investigating to

a distant location, he believed that the emergency phone call reporting shots fired in Ponemah, Minnesota (more than 25 miles from the McBride's area) was a call to divert the officers' efforts from the Redby area.  His belief was based on two facts: 1) the name given by the reported caller was not the name of anyone who lived in the Ponemah area; and 2) ambulance personnel located in the area close to where the purported shots were made in Ponemah—there on an entirely separate incident—advised over the radio that they heard no gunshots at all.[8]  However, C.I. Brunelle testified that at the time of the phone call, officers had no information that would connect Defendant to the phone number which was used to make the call.  Indeed, officers later dialed the phone number logged for the call claiming to report shots fired in the Ponemah area and listened for a ring by any of the three cellphones openly observed later in Defendant's vehicle, but none of them rang at the time officers called the number.  Police called the number logged for the Ponemah report a second time to determine if they could hear any phones ring inside of Defendant's mother's residence, but again they heard no phones ring inside Ms. Stately's residence at the second time officers called the number.

C.I. Brunelle also provided that the officers spent some time talking with Ms. Stately in an attempt to obtain consent to enter her residence without having to obtain a search warrant. Ms. Stately refused to admit them and directed them to leave her property.  Capt. Lyons further testified at the hearing that Ms. Stately had advised Officer Harlan Johnson that Defendant had left her residence in Defendant's own car.  Because Defendant's car was still then located at Ms. Stately's residence, the officers suspected that Defendant was still in the residence, and upon C.I. Brunelle's order, they secured a perimeter around the residence, without entering the property,

---

[8] Despite C.I. Brunelle's belief that the call was merely meant to divert the officers' attention from the Redby area, an officer was sent to the area, who upon arrival to the area reported no disturbance.

such that no one could enter or leave the property.[9]  The officers maintained the perimeter until

C.I. Brunelle was eventually able to obtain a search warrant to search Ms. Stately's residence at

approximately 7:35 a.m, on May 31, 2011.

## II.    DISCUSSION

Defendant argues that the search of his mother's (Ms. Stately) residence violated his

Fourth Amendment rights.  Defendant contends the search warrant upon which Ms. Stately's

residence was searched lacked probable cause and that U.S. v. Leon, 468 U.S. 897 (1984) does

not apply.  (Def.'s Mem. in Supp. of Mot. to Suppress [Docket No. 35] at 4).  Conversely, the

Government argues that "[t]he affidavit in support of the search warrant establishes probable

cause for the search," or in the alternative, suppression is not warranted because "the executing

officers relied in good faith on the existence of a facially valid search warrant."  (Supp. Mem. of

the United States in Opp'n to Def.'s Mot. to Suppress [Docket No. 36] at 1).

### a.    The Affidavit in Support of the Search Warrant Fails to Establish Probable Cause.

The Fourth Amendment guarantees the "right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV.

It further provides that "no warrants shall issue, but upon probable cause, supported by Oath or

affirmation."  Id.  Probable cause exists when "a practical, common-sense" evaluation of "all the

circumstances set forth in the affidavit," demonstrate "a fair probability that contraband or

evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238

(1983).  "Probable cause is a fluid concept that focuses on 'the factual and practical

considerations of everyday life on which reasonable and prudent men, not legal technicians,

---

[9] At the hearing, Capt. Lyons testified that in his report he had stated that the reason why C.I. Brunelle planned to obtain a search warrant was because Ms. Stately was being uncooperative.

act.'"  United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Gates, 462 U.S. at

231).  "The existence of probable cause depends on whether, in the totality of the circumstances,

there is a fair probability that contraband or evidence of a crime will be found in a particular

place."  United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (internal quotation marks

omitted).

      The sufficiency of a search-warrant affidavit is examined using "common sense and not a

hypertechnical approach."  United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (internal

quotation marks omitted).  "Therefore, when the issuing judge relied solely upon the supporting

affidavit to issue the warrant, only that information which is found within the four corners of the

affidavit may be considered in determining the existence of probable cause."  United States v.

Wiley, 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (internal quotation marks omitted).

"In ruling on a motion to suppress, probable cause is determined based on 'the information

before the issuing judicial officer.'"  United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009)

(quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)).  Nevertheless, "[a]

magistrate's determination of probable cause should be paid great deference by reviewing

courts," and "the duty of a reviewing court is simply to ensure that the magistrate had a

'substantial basis for concluding' that probable cause existed."  Gates, 462 U.S. at 236, 239

(quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

      The Government argues that the following facts establish probable cause: 1) the crime

scenes were close enough together to suggest that the same person or persons perpetrated all

crimes; 2) the shotgun casings found at two of the crime scenes appeared to be identical, again

suggesting that the same perpetrators were involved; 3) broken glass was found at the second

crime scene, which may have been from a vehicle; 4) Capt. Lyons observed Defendant's vehicle

turn into the McBride's area, shortly after which an emergency call was made about shots fired;

5) in responding to the shots fired call in the McBride's area, officers observed no other cars on

the north road leading into McBride's area; 6) only one other road (the east/west facing road) led

into McBride's area; 7) the east/west facing road leads to Ms. Stately's residence; 8) Defendant's

vehicle was found parked at Ms. Stately's residence; and 9) police uncovered a possible

"diversion" call that was calculated to be placed within one-quarter mile of Ms. Stately's

residence.  (Supp. Mem. of the United States in Opp'n to Def.'s Mot. to Suppress at 2-4).[10]

Defendant argues that probable cause is lacking because "[n]one of the information

provided in the search warrant affidavit connected Timothy Stately or the home of Theresa

Stately to any shootings, [rather,] [t]he affidavit simply sets forth where the crimes are reported

to have occurred," and "[t]hose crimes as presented in the warrant are not connected."  (Def.'s

Mem. in Supp. of Mot. to Suppress at 4).  As to the content within the four corners of the

affidavit, the Court agrees.

In considering the totality of circumstances, even in light of all the facts emphasized by

the Government, the Court does not believe that the affidavit on its face provided a substantial

basis for concluding that probable cause existed to search Ms. Stately's residence.  The first two

facts, even assuming they demonstrate that the same group of individuals perpetrated all the

crimes, establish no connection to Defendant or Ms. Stately's residence.  As Defendant

appropriately highlights, no witness had provided identification or a description of the suspects

involved in the crimes.  Nor does the fact that broken glass—possibly from a vehicle—was

---

[10] As explained by the Court at the hearing, facts pertaining to the geography and relevant distances of events described in C.I. Brunelle's affidavit, though not explicitly described in the affidavit, may nonetheless be considered by the Court in analyzing whether probable cause exists on the four corners of the affidavit because such information places into context information that the issuing judicial officer would have known simply by his familiarity with the area.  See United States v. Carhee, 27 F.3d 1493, 1498 (10th Cir. 1994) (explaining that a search for narcotics pursuant to a warrant was valid, even though "the search warrant misstated the location of the briefcase and the warrant did not authorize a nighttime search" because the issuing magistrate knew that the briefcase was to be searched at the different location and that it was nighttime).

found at the second crime scene alone provide a connection to either Defendant or the residence searched, at least on the basis of information included in the four corners of the affidavit.

The fourth, fifth, and sixth facts described by the Government above provide somewhat stronger inferences toward supporting probable cause but nevertheless still fall short. These facts alone again do not provide a sufficiently strong inference on the face of the affidavit that Defendant's vehicle was involved in any of the emergency incidents being investigated. While the Defendant's vehicle was seen turning into the McBride's area shortly before the reported shooting at the Jones's residence and officers observed no other vehicles in the immediate McBride's area around that time, as the Government acknowledges, police were observing only one of the two roads leading into McBride's area, thus leaving one other road where vehicles could enter and exit freely without the officers' knowledge.

Observing an individual entering the general area where a future crime is committed, in and of itself, does not create an inference sufficient to find probable cause. See United States v. Coker, 599 F.2d 950, 952 (10th Cir. 1979) (explaining that even though the defendant "was arrested because he had been seen in the general area of the marijuana patch . . . nothing linked defendant to the shots that were fired [in the area of the marijuana patch]"); United States v. Rodriguez, 2008 WL 52917, at *5 (S.D.N.Y. Jan. 2, 2008) ("it is well settled that mere presence at the scene of a crime does not provide probable cause to arrest.").

In Coker, police received information that the defendant intended to harvest marijuana from a marijuana patch in a wildlife refuge. Id. at 951. On the evening before the defendant's eventual arrest, officers observed defendant's "pickup truck at the crossroads nearest to the marijuana patch, which was some distance from the patch." Id. The truck was then seen leaving the area at a high rate of speed and disappeared from the officers' view. Id. The next morning,

10

police returned to the marijuana patch and observed freshly cut marijuana, and while collecting

it, heard three shots.  Id.  After several hours of "extensive patrolling" in the area, other officers

observed the pickup truck in the general neighborhood of defendant's home.  Id.  The truck,

driven by the defendant's wife, was pulled over and the male passenger, who had taken "actions

to avoid been seen" and who was observed to be "wet from the waist down and had debris on his

person characteristic of the wildlife refuge generally," was arrested after being taken to the

police "command post."  Id.  The trial court found, and the Tenth Circuit Court of Appeals

affirmed, that there was a lack of probable cause for the arrest at either the initial stop of the

vehicle or the later "formal" arrest.  Id. at 951-52.  The court explained that

> Defendant was stopped because he ducked down in the car; he was arrested
> because he had been seen in the general area of the marijuana patch, because the
> condition of his person indicated he had been in the general area of the marijuana
> patch, and because rumor had linked him to the patch. The trial court concluded
> that the government did not demonstrate any basis for crediting the rumor;
> nothing linked defendant to the shots that were fired; there was no showing that
> defendant had cut the marijuana that was discovered at the patch.

Id. at 952.

Like in Conker, although Defendant's vehicle may have been seen in the general area

where shots were later fired, its mere presence in the area of the crime is insufficient to establish

probable cause.[11]  Admittedly, the brief time frame between observing Defendant's vehicle and

hearing the gunshots in the area in this case might serve to bolster the inference that Defendant's

vehicle may have been near the scene of the shooting.  But, there is no evidence whatsoever

---

[11] Though the Court acknowledges that "[w]hile probable cause is required for both arrests and searches, [and] the meaning of the term is not exactly the same [because] [e]ach requires a showing of probabilities in somewhat different factual scenarios," United States v. Erickson, 2008 WL 1803626, at *4 n.3 (D. S.D. Apr. 18, 2008), in this case, Defendant's vehicle serves as the nexus between Ms. Stately's residence and the crime scenes at issue. Without the presence of Defendant's vehicle at Ms. Stately's residence there would be little to nothing to suggest that evidence of the crimes would be found in Ms. Stately's residence.  Even though "[i]t is not necessary that a particular person be implicated in the crime under investigation" in the analysis of a search, Erickson, 2008 WL 1803626, at *4 n.3, here, Defendant's vehicle is the connecting element to the residence.  Thus, although the probable cause determination in Conker was made with respect to an arrest, its reasoning is relevant to this case as well.

described in the affidavit that places Defendant or Defendant's vehicle squarely at the scene of any of the shootings or emergency events the night of May 30, 2011 through the early morning hours of May 31, 2011.  In the six minutes from when Defendant was seen by Capt. Lyons entering the McBride's area until shots were heard near there by C.I. Brunelle, other vehicles may have also freely entered the area.  Indeed, no one observed at what time Defendant's vehicle exited the McBride's area.  Similarly, facts seven and eight, which suggest that Defendant's vehicle travelled from the McBride's area to Ms. Stately's house, do little to connect Defendant's vehicle directly to the shooting at the Jones's residence in the McBride's area.  Thus, the evidence provided in the affidavit falls short of establishing probable cause to search the residence where the Defendant's vehicle was subsequently found.  If mere presence near a crime scene alone was sufficient to establish probable cause, officers could search the vehicle or residence of any individual who was merely observed in the general vicinity and around the same time as a reported crime without anything more.  The Government has provided no cases establishing such a broad rule.

Finally, with respect to fact nine, even if the Court were to accept the Government's argument that the emergency call reporting shots fired in the Ponemah area was merely a "diversion" call to divert the officers' investigative efforts from the Redby area, there has been no demonstrated connection of that call to either Defendant or Ms. Stately's residence.  Though the call may have been placed within one-quarter mile of Ms. Stately's residence, there is nothing in the affidavit to counter the fact that anyone driving in the area could have placed the call while passing by Ms. Stately's residence.  There is nothing on the face of the affidavit to tie

the purported "diversionary" phone call to either the Defendant or the residence belonging to his mother.[12]

After considering the totality of the circumstances, and all of the information provided by C.I. Brunelle in his written affidavit submitted in support of the application for the search warrant, the Court does not believe that the affidavit on its face provided a substantial basis for concluding that there existed a "fair probability that contraband or evidence of a crime" would be found in Ms. Stately's residence.

The Court's finding that the search warrant lacks probable cause, however, does not end the Court's inquiry.

> **b. The Evidence Need not be Suppressed Because the Good Faith Exception established in <u>United States v. Leon</u> applies.**

Although "evidence obtained as a result of a defective search warrant is generally inadmissible," <u>United States v. Guzman</u>, 507 F.3d 681, 685 (8th Cir. 2007), the United States Supreme Court, in <u>United States v. Leon</u>, recognized a good faith exception to the Fourth Amendment exclusionary rule. 468 U.S. 897, 922 (1984). In <u>Leon</u>, the Court held that the Fourth Amendment does not require suppression of "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant." <u>Id</u>. The rationale behind the rule is that "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." <u>United States v. Puckett</u>, 466 F.3d 626, 630 (8th Cir. 2006) (internal quotation marks omitted). "In the ordinary case, an officer cannot be expected to question the

---

[12] Indeed, at the hearing, C.I. Brunelle testified that when officers called the phone numbers that placed the emergency call, they listened to see if the three phones observed in the back of Defendant's vehicle would ring. None of the phones in Defendant's vehicle rang. Then, officers again called the phone number and listened to see if they could hear a phone ring from inside the windows of Ms. Stately's residence. Again, officers heard no phones ringing.

magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient . . . Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Id. (internal quotation marks omitted).   The good faith exception to the exclusionary rule is broad.  United States v. Hallam, 407 F.3d 942, 946 (8th Cir. 2005).

However, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued" which justifies suppression. Leon, 468 U.S. at 922-23.  "When assessing the good faith of the officers, we look to the totality of the circumstances, including any information known to the officers, but not included in the affidavit." United States v. Rodriguez, 484 F.3d 1006, 1011 (8th Cir. 2007).

In this case, the officers executing the search warrant were aware of some pertinent information that was inadvertently omitted from C.I. Brunelle's affidavit: Defendant's vehicle, parked at Ms. Stately's residence, had a broken rear passenger window and shattered glass could be seen scattered throughout the vehicle's backseat.  Because Capt. Lyons had observed, and C.I. Brunelle had noted in his affidavit, that "glass from a possible busted window from a vehicle" along with the shell casings were found at the second crime scene (the trailer fire), the information that Defendant's vehicle had a broken window and shattered glass in the back seat provides a basis for a nexus between Defendant's vehicle found at Ms. Stately's residence and at least one of the crime scenes; thus, establishing "a fair probability that contraband or evidence of a crime" would be found in Ms. Stately's residence.[13]  Like in Rodriguez, "[t]he officers' good-faith reliance on the validity of the [] residence search warrant was further bolstered, not

---

[13] This would be especially so in light of the close geographical and temporal proximity of all the reported incidents in the Redby area, as well as, the observation of the defendant's vehicle in the McBride's area minutes before the shooting at the Jones's residence, and then the subsequent location of Defendant's vehicle a short distance away at Ms. Stately's residence shortly after the shooting at the Jones's residence.

diminished, by additional facts known to the officers, but not included within the affidavit . . . ." 484 F.3d at 1012.

The Court in <u>Leon</u> identified four specific circumstances in which the good faith exception does not apply:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence <u>entirely unreasonable</u>; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

<u>United States v. Perry</u>, 531 F.3d 662, 665 (quoting <u>United States v. Proell</u>, 485 F.3d 427, 431 (8th Cir. 2007)).

Defendant does not specifically state or argue under which of the above four circumstance the <u>Leon</u> good faith exception would not apply in the present case, but it appears that he relies largely on the first circumstance.[14]  (Def.'s Mem. in Supp. of Mot. to Suppress at 5-6)  ("C.I. Brunelle was neither unwitting or unknowing of the falsities carried out upon the Court . . . C.I. Brunelle passed, and withheld, pertinent facts from the Court in order to get a warrant he knew lacked probable cause.").  Defendant argues that several facts, not included in C.I. Brunelle's affidavit, demonstrate that C.I. Brunelle "was aware of numerous facts that undercut any possible probable cause belief": 1) At least ten vehicles, in addition to the two mentioned in the affidavit, were seen driving in the area of the shootings; 2) only Dawn Schoenborn saw a vehicle possibly connected to the shooting, and she thought that the vehicle had two-doors; 3) no

---

[14] Defendant cites the rule for the fourth circumstance under which <u>Leon</u> does not apply but does not appear to specifically argue that <u>Leon</u> does not apply under that basis.  (Def.'s Mem. in Supp. of Mot. to Suppress at 4).  To the extent that he does, for all of the reasons stated above, the Court finds that the warrant was not so facially deficient such that the executing officers could not presume it to be valid.

witness gave any description of suspects; and 4) the source of the broken glass found at the

second crime scene had not yet been determined.  (Id. at 6-7).

As explained previously by the Eighth Circuit, "[a]n affidavit for a search warrant need

only show facts sufficient to support a finding of probable cause."  United States v. Parker, 836

F.2d 1080, 1083 (8th Cir. 1987).  "Omissions of facts are not misrepresentations unless they cast

doubt on the existence of probable cause."  Id.  "The defendant must show that: (1) the police

omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the

affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information,

would not have been sufficient to support a finding of probable cause."  United States v.

Papakee, 2007 WL 891713, at *5 (N.D. Ia. Mar. 6, 2007).  The Court does not believe that any

of the facts listed by Defendant satisfy either of those elements.

The fact that other vehicles were observed in the general Redby area, without any further

details as to where they were seen and at what time, does not overshadow the fact that

Defendant's vehicle was seen in the more immediate McBride's area of one of the shootings

essentially minutes before the time that the shots were heard.  Further, officers observed no other

vehicles in the McBride's area around that time with the exception of one (which was

appropriately described in the affidavit).

The fact that one of the witnesses had described a vehicle possibly seen near one of the

other (non-McBride's) shooting locations as a two-door does not in and of itself defeat probable

cause.  Moreover, based on the record before the Court, it was not shown that C.I. Brunelle was

aware of this information at the time that he submitted his affidavit such that it might preclude a

determination that the search was conducted in good faith.

Next, the fact that no physical description of the alleged perpetrator was given by anyone does not cast doubt on the existence of probable cause, and C.I. Brunelle never claimed in his affidavit that any description had been given.

Similarly, that the precise source of the broken glass had not yet been determined is not material to establishing probable cause.  C.I. Brunelle appropriately stated in his affidavit that the glass may have been from a "possible busted window from a vehicle," and he did not need to conclusively find that the glass was from a car window before including the information in his affidavit or executing a search in this case based upon the warrant that was ultimately issued.

Finally, Defendant makes an additional argument that C.I. Brunelle "knew there was no connection between the cell phone and the Theresa Stately residence."  However, this argument is not compelling.  The affidavit of C.I. Brunelle submitted in support of the warrant application did not say that Defendant had made what officers believed was an attempted diversionary call. The affidavit only said that it was believed the call was made in the vicinity near the McBride's shooting and where Defendant's car was later located.  While C.I. Brunelle testified at the hearing that officers called the phone number that placed the emergency call that reported shots fired in the Ponemah area, but that they did not hear any cell phones ring in either Defendant's vehicle, where three could be seen, or inside Ms. Stately's residence, as the Government argued, many plausible reasons could exist for why no cell phone was heard to ring (i.e., the phones were off, none of the phones in the vehicle were used to make the call, the phone was somewhere inside the home where it could not be heard).  The absence of a ring in response to one of the test calls neither substantially adds nor detracts from a probable cause determination when considering the totality of the circumstances.

In summary, none of the foregoing circumstances demonstrate that the "police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading," nor, if included, would any the facts argued by the Defendant have made the affidavit insufficient (when also taking into account the omitted information pertaining to the broken auto window glass actually found in Defendant's vehicle).[15]

Defendant has not argued that the <u>Leon</u> good faith exception does not apply based on any of the other three disqualifying circumstances listed in <u>Perry</u>, 531 F.3d at 665.[16]

For the reasons stated above, the Court recommends that Defendant's motion to suppress any evidence obtained as a result of the search warrant be denied.

---

[15] Nor does the Court believe that the statement in Capt. Lyon's report that C.I. Brunelle was going to obtain a search warrant because Ms. Stately was being "uncooperative" establish the necessary intent to make the <u>Leon</u> good faith exception inapplicable.  Rather, the police first attempted to enter Ms. Stately's residence by obtaining consent, and upon Ms. Stately's refusal to consent for them to enter, the officers had no choice but to seek to obtain a search warrant.

[16] Defendant also asserted that "[t]he good faith exception is complicated when the affiant and the warrant-executing officer are the same person," and appeared to suggest that <u>Leon</u> doesn't apply under such circumstances, though it cited no authority for this proposition.  (Def.'s Mem. in Supp. of Mot. to Suppress at 5).  The government provides that it has found no case which holds that "<u>Leon</u> affords police less protection when the affiant on the search warrant is also involved in the execution of the warrant."  (Supp. Mem. of the United States in Opp'n to Def.'s Mot. at 5). The Court has likewise found no authority in this circuit which holds that <u>Leon</u> does not apply when the same officer supplied the affidavit in support of the search warrant and executed the search warrant.  It has found one district court decision which states that "the Sixth Circuit has indicated that the <u>Leon</u> exception does not apply where an insufficient affidavit was prepared and submitted by the same officer who executes the warrant, and who should have realized the insufficiency of the affidavit."  <u>See</u> <u>United States v. Mosley</u>, 2008 WL 1868012, at *7 (E.D. Ky. Apr. 24, 2008).  The court's decision in <u>Mosley</u>, however, is not binding on this Court, and moreover, the court's statement appears to be in dicta.  The court's ultimate decision to suppress the evidence in <u>Mosley</u> rested on the basis that "[e]ven taking all of the evidence in the affidavit as true, none of it could lead a reasonable police officer, under the totality of the circumstances, to believe that probable cause existed to search the residence in question."  <u>Id.</u>  As such, the basis for suppression in Mosley appears to have been the third circumstance espoused in <u>Perry</u>.

**III.     CONCLUSION**

1.          Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress

Evidence Obtained as a Result of Search and Seizure [Docket No. 21] be denied.


Dated: July 2, 2012                                          s/Leo I. Brisbois
                                                            LEO I. BRISBOIS
                                                            United States Magistrate Judge

**N O T I C E**

        Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation
by filing with the Clerk of Court, and serving all parties **by July 16, 2012**, a writing that
specifically identifies the portions of the Report to which objections are made and the bases for
each objection. A party may respond to the objections within fourteen days of service thereof.
Written submissions by any party shall comply with the applicable word limitations provided for
in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the
objecting party's right to seek review in the Court of Appeals.  This Report and
Recommendation does not constitute an order or judgment from the District Court, and it is
therefore not directly appealable to the Court of Appeals.